1   M. KIRBY C. WILCOX (SB# 78576)
    E. JEFFREY GRUBE (SB# 167324)
2   ANNETTE GAMMON (SB# 211882)
    PAUL, HASTINGS, JANOFSKY & WALKER LLP
3   Twenty-Fourth Floor
    55 Second Street
4   San Francisco, CA 94105-3441
    Telephone: (415) 856-7000
5   Facsimile: (415) 856-7100          E-filing

6   Attorneys for Defendant
    UNITED PARCEL SERVICE, INC.

7

8                  UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10

11  JAMES CORRN, ERIC DUVOE, KIM            **C 03 - 2001 TEH**
    MARCHANT individually, and on behalf    CASE NO.
12  of all other similarly situated current and
    former employees of UPS,                **NOTICE OF REMOVAL OF CIVIL
13                                            ACTION TO THE UNITED STATES
                    Plaintiffs,              DISTRICT COURT UNDER 28 U.S.C. §§
14                                            1331, 1367 AND 1441(b) (FEDERAL
         vs.                                  QUESTION) AND 1332 (a) AND 1441(a)
15                                            (DIVERSITY)**
    UNITED PARCEL SERVICE, INC., dba
16  UPS, an Ohio corporation; JOHN          (Alameda Superior Court Case No. RG03
    NADDY, an individual and DOES 1          82310)
17  through 150, inclusive,

18                  Defendants.

19

20

21

22

23

24

25

26

27

28

1   TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE

2   NORTHERN DISTRICT OF CALIFORNIA, PLAINTIFFS JAMES CORNN, ERIC DUVOE,

3   KIM MARCHANT, INDIVIDUALLY AND ON BEHALF OF THE PURPORTED CLASS,

4   AND TO THEIR ATTORNEYS OF RECORD, C. BROOKS CUTTER AND WENDY C.

5   YORK AND THE LAW OFFICES OF CUTTER, RATINOFF & YORK, LLP:

6

7            PLEASE TAKE NOTICE THAT Defendant/Petitioner UNITED PARCEL

8   SERVICE, INC. ("UPS") hereby removes this action from the Superior Court of the State

9   California for the County of Alameda to the United States District Court for the Northern District

10   of California.  This removal is based on federal question jurisdiction, 28 U.S.C. §§ 1331, 1367

11   and 1441(b), and on diversity of citizenship, 28 U.S.C. §§ 1332 and 1441(a) and (b), for the

12   reasons stated below:

13

14            1.       On or about February 26, 2003, plaintiffs JAMES CORNN, ERIC DUVOE

15   and KIM MARCHANT ("Plaintiffs"), individually and on behalf of a purported class, filed a

16   Complaint in the Superior Court of the State of California for the County of Alameda entitled:

17   "James Cornn, Eric Duvoe, Kim Marchant, individually, and on behalf of all other similarly

18   situated current and former employees of UPS v. UNITED PARCEL SERVICE, INC., JOHN

19   NADDY, and Does 1 through 150" designated as Case No. RG 03 82310.  The Complaint alleges

20   the following four purported causes of action against Defendants UPS and Naddy:  1) Unpaid

21   Wages Under the Laws Of The State Of California By Plaintiffs Employed In The State Of

22   California; 2) Illegal Deductions:  Withholding Of Wages Under The Laws Of The State of

23   California By Plaintiffs Employed In The State Of California; 3) Failure To Compensate For All

24   Hours Worked In Violation Of The California Labor Code; and 4) Violations of California

25   Business And Professions Code Section 17200 et seq.  *See* Declaration of Annette Gammon

26   ("Gammon Decl.") ¶ 2, Ex. A (Summons and Complaint filed in Superior Court).

27

28

1      2.     On April 2, 2003, Plaintiffs, through their counsel, caused a copy of the

2   Summons and Complaint to be served on UPS. *See* Gammon Decl. ¶ 3, Ex. B (Plaintiffs' proof

3   of service, filed with the Superior Court). The Complaint is the initial pleading setting forth the

4   claim for relief upon which this action is based and may be removed. Accordingly, this Notice of

5   Removal is being filed within thirty (30) days after service of the initial pleading upon UPS and is

6   timely filed pursuant to 28 U.S.C. Section 1446(b).

7

8      3.     UPS is informed and believes, and on that basis alleges, that individual

9   defendant Naddy has not been served with the Summons and Complaint in this action. *See*

10   Gammon Decl. ¶ 4.

11

12      4.     On April 30, 2003, UPS filed its Answer to Plaintiffs' Unverified

13   Complaint in the Superior Court of Alameda. *See* Gammon Decl. ¶ 5, Ex. C (UPS's Answer filed

14   with the Superior Court on April 30, 2003).

15

16      5.     Notice of this removal is being given to both the adverse party and the state

17   court pursuant to 28 U.S.C. Section 1446(d). UPS will file a Proof of Service with this Court

18   promptly after service. *See* Gammon Decl. ¶ 6, Ex. D and E. Exhibits A – E attached to the

19   Declaration of Annette Gammon and filed concurrently herewith constitute all process, pleadings

20   and orders served on or by UPS in this action. *See* Gammon Decl. ¶ 7.

21

22   FEDERAL QUESTION JURISDICTION IS PRESENT

23      6.     This is a civil action over which this Court has original jurisdiction under

24   28 U.S.C. Sections 1331 and 1367. Under section 301 of the Labor Management Relations Act

25   ("LMRA"), 29 U.S.C. Section 185, the district courts of the United States have original

26   jurisdiction over any action brought for violation(s) of a contract between an employer and a

27   labor organization representing employees in an industry affecting commerce. Therefore, UPS

28   may remove this action pursuant to 28 U.S.C. Section 1441(b) because Plaintiffs' claims cannot

-3-

1    be resolved without reference to the collective bargaining agreement which governs the terms and

2    conditions of their employment for UPS, so their claims are preempted by the LMRA.

3

4         7.    The Complaint may be removed on the basis of federal question

5    jurisdiction in that:

6

7         (a)    At all times relevant to this action, UPS was and is an employer

8    employing employees in an industry affecting commerce, as defined by the LMRA, 29 U.S.C.

9    Section 141 et seq.

10

11        (b)    At all times relevant to this action, Plaintiffs were and are

12   employees of UPS represented by a labor organization and employed pursuant to a collective

13   bargaining agreement ("CBA") between UNITED PARCEL SERVICE, INC. and the

14   International Brotherhood of Teamsters ("Union").  *See* Harvey Quinn Declaration ("Quinn

15   Decl.") ¶ 2, Ex. A-D.  The Union is a labor organization representing employees in an industry

16   affecting commerce as defined in the LMRA.  See Compl. ¶ 24 (implicitly recognizing that

17   Plaintiffs' employment was at all times and is governed by the applicable collective bargaining

18   agreement).

19

20        (c)    The CBA governs the employment relationship between Plaintiffs

21   and UPS and governs all aspects of Plaintiffs' employment.  Plaintiffs allege employment with

22   UNITED PARCEL SERVICE, INC. and implicitly recognize that the terms of their employment

23   are governed by the CBA.  *See* Complaint ¶ 24 ("There is no pre-emption of PLAINTIFFS'

24   claims because claims are based on state law.  There is no dispute over the terms of the collective

25   bargaining agreement ("CBA") and there is no need to interpret the terms of the CBA.")  In

26   addition, Plaintiffs' First Cause of Action specifically alleges breach of the CBA.  *See* Complaint

27   ¶ 42 ("For the four (4) years preceding the filing of this lawsuit, named PLAINTIFFS and

28   members of the class (collectively "Plaintiffs") were and/or are employed by Defendants within

-4-

1   the State of California. DEFENDANTS were required to compensate PLAINTIFFS for all hours

2   worked, but failed to carry out their duties and responsibilities as an employer imposed under the

3   laws and regulations of the State of California and *breached the employment contract* by: a.

4   failing to pay PLAINTIFFS for all hours worked; failing to provide rest periods as required by

5   law; failing to provide meal periods as required by law; "dinging" (illegally deducting wages) for

6   inability to meet the "Incentive Plan" or "Bonus Plan" or being forced to work through

7   lunch/meal periods; illegally and not accurately recording time worked; and other reasons to be

8   discovered.") (emphasis added).

9

10          (d)     Section 301 of the LMRA completely preempts any and all

11  purported state law causes of action by an employee that are based on rights created by a

12  collective bargaining agreement or which require interpretation of a collective bargaining

13  agreement for their resolution. *See Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220, 105 S. Ct.

14  1904 (1985) ("[W]hen resolution of a state-law claim is substantially dependent upon analysis of

15  the terms of [a collective-bargaining] agreement . . . that claim must either be treated as a § 301

16  claim or dismissed as pre-empted by federal labor-contract law.") (citation omitted); *Hayden v.*

17  *Reickerd*, 957 F.2d 1506, 1509 (9th Cir. 1991) (Section 301 of the LMRA completely preempts

18  state law claims either when those claims are "founded directly on rights created by collective-

19  bargaining agreements," or when a claim based on a state law right "requires the interpretation of

20  a collective bargaining-agreement").

21

22          (e)     Claims that are completely preempted by section 301 of the LMRA

23  are treated as claims arising under federal law of which this Court has original jurisdiction under

24  28 U.S.C. Section 1331. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 393, 107 S. Ct. 2425

25  (1987) ("Once an area of state law has been completely pre-empted, any claim purportedly based

26  on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises

27  under federal law. . . The complete pre-emption [doctrine] is applied primarily in cases raising

28  claims pre-empted by § 301 of the LMRA.") (citations omitted); *see Franchise Tax Bd. v.*

-5-

1  *Construction Laborers Vacation Trust*, 463 U.S. 1, 23, 103 S. Ct. 2841 (1983) ("[T]he

2  preemptive force of § 301 is so powerful as to displace entirely any state cause of action 'for

3  violation of contracts between an employer and a labor organization.' Any such suit is purely a

4  creature of federal law, notwithstanding the fact that state law would provide a cause of action in

5  the absence of § 301.") (footnote and citations omitted); *Stikes v. Chevron USA, Inc.*, 914 F.2d

6  1265, 1267 (9th Cir. 1990) (Under the complete preemption doctrine, "[t]he preemptive force of a

7  statute [may be] so 'extraordinary' that it 'converts an ordinary state common-law complaint into

8  one stating a federal claim for purposes of the well-pleaded complaint rule.' . . . Section 301 of

9  the LMRA is an example of a statute which has such a powerfully preclusive effect.") (citations

10  omitted); *Galvez v. Kuhn*, 933 F.2d 773, 775-76 (9th Cir. 1991) ("'Once an area of state law has

11  been completely preempted, any claim purportedly based on that preempted state law is

12  considered . . . a federal claim, and therefore arises under federal law.' In those instances, a claim

13  that seemingly rests solely on state law may nonetheless be removable.") (citation and internal

14  quotations omitted).

15

16  (f) Under the artful pleading doctrine, a plaintiff may not avoid federal

17  jurisdiction simply by casting in state law terms a claim that can be made only under federal law.

18  *See Olguin v. Inspiration Consol. Copper Co.*, 740 F.2d 1468, 1472 (9th Cir. 1984)

19  ("[E]mployees frequently attempt to avoid federal law by basing their complaint on state law,

20  disclaiming any reliance on the provisions of the collective bargaining agreement .... In such

21  cases the 'artful pleading' doctrine requires that the state law complaint be recharacterized as one

22  arising under the collective bargaining agreement. The case may then be removed to federal

23  court and adjudicated under the appropriate federal law."); *Newberry v. Pacific Racing Ass'n*, 854

24  F.2d 1142, 1146 (9th Cir. 1988) ("[T]he key to determining the scope of section 301 preemption

25  is not based on how the complaint is framed, but whether the claims can be resolved only by

26  referring to the terms of the bargaining agreement."); *Truex v. Garrett Freightlines, Inc*, 784 F.2d

27  1347, 1350 (9th Cir. 1985) (court may look to facts outside of the complaint to determine whether

28  an "artfully pleaded" state claim is in reality a section 301 claim for breach of the collective

-6-

1  bargaining agreement) (citation omitted); *Eitman v. New Orleans Public Service Inc.*, 730 F.2d

2  359, 366 (5th Cir. 1984) ("[W]here a state cause of action is preempted by section 301, the

3  federal courts have original subject matter jurisdiction over the action despite the absence of a

4  federal claim on the face of the complaint.").

5

6        (g)      As demonstrated below, Plaintiffs' First, Second, Third and Fourth

7  causes of action are "artfully pleaded" claims for alleged violations of the CBA and/or which

8  require interpretation of the CBA in order fully to resolve them.  Hence, these claims are

9  completely preempted by section 301 of the LMRA and are properly removed on the grounds of

10  federal question jurisdiction.

11

12       (h)      Plaintiffs' First, Second, Third and Fourth Causes of action for

13  unpaid wages, illegal deduction of wages, failure to compensate and unfair business practices are

14  each premised on allegations that UPS's "business practices" (all of which are governed by the

15  CBA) prevented and coerced Plaintiffs to skip meal and rest breaks (which are also provided by

16  the CBA).  Complaint ¶¶ 21-23.  Plaintiffs explain that the coercion arises from the fact that

17  employees face disciplinary action (another issue governed by the CBA) if they do not comply

18  with UPS's time studies and other business practices.[1]  *See* Complaint ¶ 22 (alleging that UPS

19  sets "*unrealistic time deadlines* that drivers are expected (and *required) to meet or face discipline.*

20  By the sheer volume of packages that must be picked up or delivered by time sensitive deadlines,

21  UPS *prevents* drivers from being able to take rest periods and/or meal periods interspersed

22  throughout the day.") (emphasis added).  Plaintiffs' claims cannot be addressed without

23  interpretation of, among other provisions, the following relevant provisions of the CBA:

24

25  [1] Plaintiffs contend that the following business practices *prevent* Plaintiffs from taking their meal
and rest periods:  UPS's guarantee to customers regarding delivery times, UPS's requirements

26  regarding reporting to work, UPS's time studies estimating the time to deliver a particular route
with particular packages, UPS's practices regarding the number of routes utilized at any given

27  time, and UPS's website which allows direct tracking of packages by UPS customers.  *See*
Complaint ¶¶ 21-23.

28

1                    (i)      Entitlement to meal periods and rest periods under

2 California law and the CBA depends upon the amount of time worked.  Drivers report their time

3 worked pursuant to the terms and practices defined by the CBA:

4

5                 Section 6 – Time Clocks

6                 The Employer shall install time clocks.  Such time clocks must be
kept accurate.  Employees shall punch in on such time clocks when

7                 they report to work and shall punch out when all work is completed.
The Employer shall not alter an employee's time card in any

8                 manner without clearing the alteration with the employee.

9 *See* Quinn Decl. at ¶ 2, Exh. B at p.31; *see also* Quinn Decl. ¶ 2, Ex. C at p. 30.  Because much of

10 a driver's day is spent conducting unsupervised work and because meal and rest period

11 calculations are based upon the driver's self-reported time worked, the meal and rest period issue

12 relies upon the interpretation of the CBA's provisions regarding recording time. *See* Quinn Decl.

13 at ¶ 2, Ex. B, Article 22, p. 39-42 (setting forth rules regarding hours of work); Ex. A, Article 37,

14 p. 103-04 (setting forth "fair day's work for a fair day's pay" policy which "shall be observed at

15 all times" and requiring that "employees shall perform their duties in a manner that best

16 represents the Employer's interest."); Ex. A, Article 12, p. 29 (prohibiting polygraph testing of

17 employees, but setting forth mechanism to "inspect the record of an employee's time recorded on

18 the DIAD[2] or other device for previous days' work.").  For example, when does a driver "report

19 to work"?  When is a driver's work "completed"?  And what meal period does UPS "provide"

20 drivers?  Plaintiffs claim that UPS does not provide meal periods; though the CBA shows that it

21 does.  This issue cannot be resolved without reference to the CBA.

22

23                    (ii)     The CBA not only states that employees *shall* take their

24 bargained for meal periods and breaks, it further defines when these breaks must be taken:

25

26 _____

27 [2] Drivers utilize hand-held data collection devices called Delivery Information Acquisition
Devices ("DIAD's") which enable them to collect and record pickup, delivery and time-card

28 information along with customer signatures while performing their routes.

Article 12 – General Provisions

Section 1 – Rest Periods

All employees shall be allowed to take a rest period during the first (1st) half of any shift and a rest period during the second (2nd) half of any shift. House rules regarding the time for such periods shall be mutually agreed upon between the Employer and the secretary, or other full-time employee of the Union. Disagreements under this Section will be referred to United Parcel Service and the Union Policy Committee.

. . .

Article 22 – Hours of Work

Section 5 – Lunch Period

The lunch period shall not be less than one-half (1/2) hour or more than one (1) hour in duration. The lunch period shall commence not less than four (4) hours after the employee starts work, and shall be completed not later than six (6) hours after the commencement of the employee's work. If the employee is directed to take a one-half (1/2) hour lunch, the remaining one-half (1/2) hour will be paid at the over-time rate.

*See* Quinn Decl. at ¶ 2, Exhibit B at p. 30, 42; *see also* Quinn Decl. ¶ 2, Exh. C at p. 29, 38. To analyze Plaintiffs' claims, the Court must interpret the ambiguous language in these provisions. For example, what constitutes a "shift"? What are the "house rules" that govern when a rest period is taken? Similarly, with regard to the lunch period, how is an employee "directed" to take a one-half hour lunch?

           (iii)      Further, even if the Court could find that plaintiffs were working through their meal periods without interpreting the CBA, it would be impossible to assess the remedy for employees who took a half-hour lunch without interpreting the CBA's allowance of overtime pay for the second half-hour. *See, e.g., Adames v. Exec. Airlines, Inc.*, 258 F.3d 7, 12, 14-15 (1st Cir. 2001) (holding that plaintiffs' claim for uncompensated meal periods was preempted because the meal period entitlement requires "'interpretation of the Agreement's 'duty time' requirements and the various types of duty status,' as well as industry-specific practices . . . . [and] Even if [the court could find that plaintiffs were working through their meal

-9-

1  periods without interpreting the CBA], it would be impossible to assess the remedy, payment at

2  twice the hourly rate, without [interpreting the CBA]"; recognizing that Circuit courts "almost

3  always find that interpretation of the [relevant CBA] is necessary for resolution of [wage and hour

4  claims] if the agreement addresses those same subjects and the meaning of the statutory language

5  as applied to the terms of the CBA is unclear").

6

7          (iv)    In addition to defining that meal and breaks are to be taken

8  and how they are to be taken, the terms of the CBA, including the provisions governing

9  disciplinary action and grievance procedures, are necessarily implicated by Plaintiffs' coercion

10  theory. *See* Quinn Decl. ¶ 2, Exhibit A, Article 7, p. 16-24 (setting forth grievance procedures);

11  Exhibit B, Article 4, p. 17 (providing for discharge or suspension for just cause); Exhibit B,

12  Article 7, p. 19-24 (establishing grievance procedures); Exhibit A, Article 37, p. 104 (establishing

13  that "[n]o employee shall be disciplined for exceeding personal time based on data received from

14  the DIAD/IVIS or other information technology" and that "[a]ny alleged violation of this Article

15  shall be subject to the applicable grievance procedure"); Exhibit D, Article 37 (setting forth

16  detailed and specific grievance procedure for driver complaints regarding having to work over 9.5

17  hours per day). Plaintiffs allege that they are subject to discipline if they do not meet the

18  Company's time standards for deliveries, but the Court cannot resolve this issue without delving

19.  into the CBA's disciplinary procedures. All discipline is governed by the CBA.

20

21          (v)    Numerous other provisions and collectively bargained for

22  practices are implicated and must be interpreted to analyze Plaintiffs' claims. Plaintiffs allege

23  that they are subjected to an "illegal deduction of wages ('dinging') for failure to meet the 'Bonus

24  Plan' or 'Incentive Plan.'" *See* Complaint ¶ 25, 42.[3] To analyze the merits of this claim, a Court

25  must interpret the collectively bargained bonus system at specific UPS facilities. Further, the

26  CBA's provisions relating to the health and safety of drivers while performing their routes,

27  _____

28  [3] Bonus plans reward drivers for timely performance of their routes.

-10-

1   including abiding by all federal rules, regulations and standards or orders applicable to

2   commercial motor vehicle safety or health, are further implicated by Plaintiffs' coercion theory.

3   *See* Quinn Decl. ¶ 2, Exhibit A, Article 18, Section 1, p. 41 (prohibiting employee discipline for

4   refusal to violate stat or federal rules and regulations); Exhibit B, Article 11, Section 2, p. 28

5   (same); Exhibit B, Article 11, Section 3, p. 29-30 (providing that "[n]o driver shall be required to

6   violate traffic laws or overloading regulations"); Exhibit C, Article 10, Section 2, p. 28 (same).

7

8           (i)       In cases such as this, where the subject matter of the wage and hour

9   claim requires the interpretation of the CBA, the claim is preempted by section 301. *See, e.g.,*

10  *Adames v. Exec. Airlines, Inc.*, 258 F.3d 7, 12, 14-15 (1st Cir. 2001) (holding that plaintiffs' claim

11  for uncompensated meal periods was preempted because the meal period entitlement requires

12  "'interpretation of the Agreement's 'duty time' requirements and the various types of duty status,'

13  as well as industry-specific practices . . . . [and] Even if [the court could find that plaintiffs were

14  working through their meal periods without interpreting the CBA], it would be impossible to

15  assess the remedy, payment at twice the hourly rate, without [interpreting the CBA]"; recognizing

16  that Circuit courts "almost always find that interpretation of the [relevant CBA] is necessary for

17  resolution of [wage and hour claims] if the agreement addresses those same subjects and the

18  meaning of the statutory language as applied to the terms of the CBA is unclear"); *Firestone v.*

19  *Southern Cal. Gas Co.*, 219 F.3d 1063, 1066 (9th Cir. 2000) (plaintiffs' overtime claim was

20  preempted because the "premium wage rate" at issue could not be determined without

21  interpreting the CBA), *cert. denied*, 536 U.S. 958 (2002).

22

23  ## ALTERNATIVELY, THIS COURT HAS JURISDICTION BECAUSE THE NON-SHAM PARTIES ARE COMPLETELY DIVERSE IN CITIZENSHIP

24

25          8.        This removal also is based on diversity of citizenship, pursuant to 28

26  U.S.C. Sections 1332 and 1441(a) and (b), for the reasons stated below:

27

28

-11-

1         (a)     The Complaint, and each alleged cause of action contained therein,

2 may be properly removed on the basis of diversity of citizenship jurisdiction, in that it is a civil

3 action between citizens of different states and the matter in controversy exceeds the sum of

4 $75,000, exclusive of interest and costs. 28 U.S.C. § 1332.

5

6         (b)     Petitioners/Defendants are informed and believe, and on that basis

7 allege, that Plaintiffs are now, and were at the time this action was commenced, citizens of the

8 State of California within the meaning of 28 U.S.C. Section 1332(a), because their place of

9 residence and domicile was and is within the State of California. *See* Complaint ¶ 4 (alleging

10 that Plaintiffs are currently and at all times mentioned herein, residents of California).

11

12         (c)     Petitioner/Defendant United Parcel Service, Inc. is now, and was at

13 the time this action was commenced, a citizen of the State of Georgia within the meaning of 28

14 U.S.C. Section 1332(c)(1), because it is now and was at all material times incorporated under the

15 laws of the State of Georgia, and maintains, and at all material times maintained, its principal

16 place of business in the State of Georgia. *See* Gammon Decl. ¶ 9.

17

18         (d)     Individual defendant Naddy, although a citizen of the State of

19 California, is a sham defendant because, as set forth below, he cannot be held liable for any of the

20 causes of action asserted against him in Plaintiff's Complaint. Accordingly, his presence does not

21 destroy diversity. *McCabe v. General Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987) (former

22 employee failed to state a cause of action under California law against his individual supervisors;

23 thus their joinder as defendants did not destroy diversity); *Scopas v. Armstrong World Indus.*, 114

24 L.R.R.M. (BNA) 2933, 2934-35 (C.D. Cal. 1983), *aff'd*, 770 F.2d 171 (9th Cir. 1985) (discharged

25 employee's joinder of former supervisor as a non-diverse party was fraudulent; plaintiff could

26 state no valid cause of action against him).

27

28

-12-

NOTICE OF REMOVAL

1          (e)     Plaintiffs assert four purported causes of action against Naddy: 1)

2    Unpaid Wages Under the Laws Of The State Of California By Plaintiffs Employed In The State

3    Of California; 2) Illegal Deductions: Withholding Of Wages Under The Laws Of The State of

4    California By Plaintiffs Employed In The State Of California; 3) Failure To Compensate For All

5    Hours Worked In Violation Of The California Labor Code; and 4) Violations of California

6    Business And Professions Code Section 17200 et seq. Naddy cannot be held liable for any of

7    these claims. *See Reynolds v. Bement*, 107 Cal. App. 4th 783, 132 Cal. Rptr. 2d 384, 393, 400

8    (2003) (individual manager was not "employer" who could be held personally liable for

9    violations of state wage and hour laws or unfair business practices under Business and

10   Professions Code Section 17200; plaintiff failed to allege specific participation by the individual

11   manager that would give rise to liability under Section 17200; demurrer affirmed). Here,

12   Plaintiffs do not even mention Naddy in any factual allegations.

13

14         (f)     "If the Plaintiff fails to state a cause of action against a resident

15   defendant . . . the joinder of the resident defendant is fraudulent." *McCabe*, 811 F.2d at 1339

16   (citation omitted). Accordingly, for purposes of removal, the citizenship of Naddy should be

17   disregarded.

18

19         (g)     The presence of Doe defendants in this case has no bearing on

20   diversity with respect to removal. *See* 28 U.S.C. § 1441(a) ("For purposes of removal under this

21   chapter, the citizenship of defendants sued under fictitious names shall be disregarded.").

22

23         (h)     The amount in controversy exceeds the jurisdictional minimum of

24   $75,000. The named plaintiffs purport to seek less than $75,000 in compensatory damages. *See*

25   Complaint ¶ 26. However, they also seek attorneys' fees and punitive damages. *See id.* Prayer

26   for Relief, ¶¶ 8-9. Based on the nature of the allegations and the damages sought, Plaintiffs have

27   placed in controversy an amount exceeding $75,000, exclusive of costs and interests. In

28   determining whether a complaint meets the $75,000 threshold of 28 U.S.C. Section 1332(a), a

-13-

1   court may consider the aggregate value of claims for compensatory and punitive damages, as well

2   as attorneys' fees. *See, e.g., Bell v. Preferred Life Ass. Soc'y*, 320 U.S. 238, 240, 64 S. Ct. 5

3   (1943) ("Where both actual and punitive damages are recoverable under a complaint each must

4   be considered to the extent claimed in determining jurisdictional amount.") (footnote omitted);

5   *Goldberg v. CPC Int'l, Inc.*, 678 F.2d 1365, 1367 (9th Cir. 1982) (attorneys' fees may be taken

6   into account to determine jurisdictional amount). Here, although UPS denies any liability

7   whatsoever, Plaintiffs' each seek unpaid wages of potentially more than one hour per day for four

8   years. Considering an average of 250 working days in a year and an average wage rate of

9   $23.00/hour, each Plaintiff has placed into controversy at least $23,000 in compensatory damages

10  alone. In addition, Plaintiffs seek penalties of potentially one hour per work day since January 1,

11  2001. *See* Complaint, Prayer for Relief ¶ 5. This potentially equates to $23.00/hour times 600

12  days or more, or $13,800. By claiming punitive damages and attorneys' fees on top of that, they

13  have placed in controversy over $75,000 each. Some examples of attorneys' fees awards in wage

14  and hour cases include: *Judson v. Interfin Corp.*, Superior Court of Los Angeles County, Case

15  No. NC 026 818 (single plaintiff case alleging lost wages and commissions resulting in award of

16  attorneys' fees and costs in the amount of $123,970); *Livingston, Pimentel, Potz v. Chester*,

17  Superior Court of San Diego, Case No. GIC 768263 (wage and hour class action resulting in

18  award of $190,000 in attorneys' fees and costs); *Brehm et al. v. City of Los Angeles*, United States

19  District Court Santa Ana, Case No. CV024979JFW (class action lawsuit alleging off-the-clock

20  and skipped meal periods resulting in award of $2,240,000 in attorneys' fees).[4]

21

22          9.       Because Plaintiff and Petitioner/Defendant United Parcel Service, Inc. are

23  citizens of different states, and because the Court may disregard the citizenship of Naddy and the

24  Doe defendants, there is complete diversity between the parties. Further, because there is

25

26

_____

27  [4] For the Court's convenience, copies of the referenced jury verdict summaries are attached hereto
    as Exhibits A, B and C respectively.

28

-14-

1   complete diversity and because the amount in controversy threshold is met, the requirements for

2   removal under 28 U.S.C. Sections 1332(a) and 1441(a) are satisfied.

3

4               WHEREFORE, Petitioners/Defendants remove the above-entitled action now

5   pending in the Superior Court of the State of California for the County of Alameda to this Court.

6

7   DATED: May 1, 2003                      PAUL, HASTINGS, JANOFSKY & WALKER LLP

8

9

10                                          By: _____
                                                         E. JEFFREY GRUBE
11
                                            Attorneys for Defendant
12  SF/275881.1                             UNITED PARCEL SERVICE, INC.

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          -15-

**EXHIBIT A to:**


**NOTICE OF REMOVAL OF CIVIL ACTION TO THE UNTIED STATES
DISTRICT COURT UNDER 28 U.S.C. §§ 1331, 1367 AND 1441 (b) (FEDERAL
QUESTION) AND 1332 (A) and 1441 (a) (DIVERSITY)**

1 of 1 DOCUMENT

**Jury Verdict Weekly (California)** Copyright 2001 JURY VERDICTS WEEKLY

RICHARD W. JUDSON v. INTERFIN CORPORATION

Case No. NC 026 818

December 14, 2001

**TOPIC:** Breach of Contract: Employment -- Wages/Former Salesman Awarded $528,000 for Owed Past Wages

**RESULT:** $528,055

**DISBURSEMENT:** The jury awarded $528,055. The plaintiff's counsel reported filing a motion for attorney fees and costs, which the court granted. The court awarded attorney fees and costs of approximately $123,970 to the plaintiff. Richard Judson $528,055 economic damages

**INJURY:** The plaintiff claimed lost salary, draw monies and prejudgment interest, pursuant to Labor Code Section 218.6, totaling approximately $525,000. He also claimed a statutory penalty of $7,500 pursuant to Labor Code Section 203, as well as attorney fees and expenses under Labor Code Section 218.5.

**STATE:** California

**COURT:** Superior Court of Los Angeles County, Long Beach

**JUDGE:** Hon. James L. Wright

**PLAINTIFF COUNSEL:** Steven C. Rice; Wiezorek, Rice & Lovelace; Long Beach, CA (Richard W. Judson)

**DEFENDANT COUNSEL:** Walter J. Wilson; Law Offices of Walter J. Wilson; Long Beach, CA (Interfin Corporation)

**SUMMARY:** A Los Angeles County jury awarded $528,055 to a salesman who alleged that his former employer failed to pay him his past wages and commissions.
On March 2, 1998, the 53-year-old plaintiff began working for defendant Interfin Corp., a company that leased office equipment and machinery to other business. The plaintiff was hired as a salesman pursuant to a written contract, which was to be binding upon the parties unless replaced by another signed agreement. The plaintiff claimed that the compensation that Interfin agreed to pay for services consisted of two elements--base pay and commissions. The annual base pay was to be $93,000 and was characterized as part salary and part nonrecoverable draw. The plaintiff claimed that he was also to receive commissions of 40% of the "gross margin" on "all lease transactions completed from either new business or from company assigned accounts." The "gross margin" was to be calculated and present-valued, and the commission was to be paid thereon "immediately to [the plaintiff] upon funding by a qualified debt source." The "gross margin" was also to include, as a minimum: 1) the deposits; 2) prorated rents during the schedule build period; 3) payments during On-Site Test Allowance periods; 4) payments during the interim rental periods; 5) payments during the base lease term; and 6) the end-of-term residual value. The last item was to be determined by either contractually guaranteed residuals or by referencing estimated values quoted by the equipment vendor.
The plaintiff claimed that Interfin failed to make the required payments to him on a regular basis. Finally, the plaintiff claimed that Interfin attempted to unilaterally change the compensation structure. According to the plaintiff, when he

JURY VERDICTS WEEKLY (CALIFORNIA)

refused to sign, the plaintiff was told that he would no longer be receiving his base pay, and that he would be working on a commission basis only.

According to the plaintiff, he was never paid any commissions for two leases that he had negotiated, and that while he worked his last three months with the defendant, he received no compensation at all. Finally, the plaintiff asserted that he continued to work on closing a major new lease to avoid being "cut out of the deal." On July 9, 1999, the plaintiff quit his job, after he claimed that he received assurance from Interfin that he had earned his commission on the deal. Subsequently, the plaintiff was never paid any commission for the deal.

The plaintiff asserted that the defendant breached the employment contract when it failed to pay his base pay and commissions on various leases that he closed.

The defendant, on the other hand, maintained that the contract was not breached because the contract did not provide for the plaintiff to receive commissions on end-of-term residuals. The defendant also asserted that the plaintiff left the company before the last major lease was completed; therefore, he was not owed a commission.

**P-EXPERTS:** Rick Williams; financial analysis and assessments; Newport Beach, CA

**D-EXPERTS:** Michael O'Connell; financial analysis and assessments; Naples, FL

**MISCELLANEOUS:** Trial length: 5 days; Deliberations: 2 days

**SETTLEMENT TALKS:** DEMAND $125,000; OFFER $12,000

**ISSUE:** VOLUME 1, NUMBER 15

**EXHIBIT B to:**

**NOTICE OF REMOVAL OF CIVIL ACTION TO THE UNTIED STATES DISTRICT COURT UNDER 28 U.S.C. §§ 1331, 1367 AND 1441 (b) (FEDERAL QUESTION) AND 1332 (A) and 1441 (a) (DIVERSITY)**

1 of 1 DOCUMENT

**Jury Verdict Weekly (California)** Copyright 2002 JURY VERDICTS WEEKLY

SCOTT L. LIVINGSTON, ROBERT PIMENTEL, RONALD J. PONTZ JR. v.
JONATHAN PAUL CHESTER, DBA LIMOUSINES BY LINDA

Case No. GIC768263

October 10, 2002

**TOPIC:** EMPLOYMENT: WAGES AND HOURS/TIPS IN FARES NOT PART OF MINIMUM WAGE CALCULATIONS

**RESULT:** $ 360,000; The jury returned a verdict for the drivers of $ 360,000. Interest and attorney fees brought the recovery to $ 550,000.

**INJURY:** The plaintiff limousine drivers sought to recover lost wages, unpaid overtime and unpaid "split shift" premiums.SAN DIEGO

**STATE:** California

**COURT:** Superior Court of San Diego County, San Diego, CA

**JUDGE:** Robert E. May

**PLAINTIFF COUNSEL:** David J. Gallo; Law Office of David J. Gallo; Del Mar, CA

**DEFENDANT COUNSEL:** William T. Carss; Law Offices of Richard A. Higgins; San Diego, CA; Richard A. Higgins; Law Offices of Richard A. Higgins; San Diego, CA

**SUMMARY:** Drivers for a limousine company were to be paid minimum wage, with gratuities included in the fare. The company sought to credit the included gratuities against its obligation to pay the minimum wage.
The driver plaintiff class sued to recover the minimum wage and overtime pursuant to Labor Code Section 203. Suit was brought under Labor Code Section 1194 and IWC Wage Order Number 9.
The plaintiffs contended that the included gratuities were not part of salary compensation but were tips, that is, gratuities which could be credited against minimum the wage (Labor Code Section 351). The plaintiffs contended that the defendant was required to pay overtime when drivers worked the number of hours stated in Wage Order Number 9. The defendant contended that the element of compensation entitled gratuity was not a true gratuity, because it was included in the fare billed to the customer.

**P-EXPERTS:** Patrick Jelsema; financial analysis & assessments; San Diego, CA; Tucker McElroy, PhD; statistics; San Diego, CA

**MISCELLANEOUS:** TRIAL DETAILS Trial Length: 6 days; Jury Deliberations: 1 day; Sidney Bernstein

**POST TRIAL MOTION:** CASE STATUS Motions for new trial and JNOV were denied on Jan. 24, 2003. The defendant has filed a notice of appeal. The verdict was reached approximately one year and four months after the case was filed.

**EXHIBIT C to:**


**NOTICE OF REMOVAL OF CIVIL ACTION TO THE UNTIED STATES DISTRICT COURT UNDER 28 U.S.C. §§ 1331, 1367 AND 1441 (b) (FEDERAL QUESTION) AND 1332 (A) and 1441 (a) (DIVERSITY)**

1 of 1 DOCUMENT

Jury Verdict Weekly (California) Copyright 2002 JURY VERDICTS WEEKLY

EDWARD BREHM; STELLA LARA, ET AL. v. CITY OF LOS ANGELES

Case No. CV024979JFW

December 13, 2002

**TOPIC:** EMPLOYMENT: Wages and Hours -- Fair Labor Standards Act/LAPD Employees Sued City for Unpaid Overtime

**RESULT:** $ 4,480,000; The city agreed to pay underlying damages of $ 4,480,000, consisting of backpay of $ 3,360,000 and liquidated damages of $ 1,120,000, plus attorney fees of $ 2,240,000. Each plaintiff received a pro rata amount, varying from $ 500 to $ 100,000.

**INJURY:** Under 29 U.S.C. § 207, the plaintiffs were seeking backpay, liquidated damages and attorney fees, totaling in the range of $ 5.5 million to $ 11 million.

**STATE:** California

**COURT:** United States District Court, Central District, Santa Ana, CA

**JUDGE:** Gary L. Taylor

**PLAINTIFF COUNSEL:** Gregory G. Petersen; Petersen Law Firm; Costa Mesa, CA; Terri N. Marcus; Petersen Law Firm; Costa Mesa, CA

**DEFENDANT COUNSEL:** Peter J. Brown; Liebert Cassidy Whitmore; Los Angeles, CA; Brian P. Walter; Liebert Cassidy Whitmore; Los Angeles, CA

**SUMMARY:** The Los Angeles Police Department employees, sworn officers holding the rank of lieutenant and below, worked hours prior to the start of their shifts, after the end of their shifts, and during their meal periods, which they alleged were not compensated by the city of Los Angeles. Some 590 officers, lieutenants and detectives ultimately joined the Fair Labor Standards Act (FLSA) collective action.
According to the class action, beginning in August 1998, the plaintiffs were told, or pressured by their supervisors, not to submit overtime slips but rather to adjust or flex their schedules, known as "white time." And either the plaintiffs were not permitted to use the flex time, or they could not adjust off all of the hours of uncompensated overtime.
The city's primary defense was that no hours were worked without compensation. The other major defense was that if a violation of the FLSA occurred, it was done in good faith, and the city did not act willfully.

**ISSUE:** VOLUME 2, NUMBER 12